Okay, good morning. I'm Judge Gould and I'm delighted to be sitting with Judge Fisher and Judge Wallinson on this to hear your arguments. I think we have this set for 30 minutes per side, so if appellant would like to make rebuttal argument, please don't use up all the time on the first shot. The clock counts down and if it'll turn yellow and then red. Red is supposed to mean stop and if any panel member has questions we can go further, but we would like to try to complete the arguments in an hour. Okay, we will start with petitioner appellant and this is Ms. Fisher for Pizzuto. And I trust we're not related. Pardon me, Your Honor? I trust we're not related. As a matter of fact, though we spell our name the same, which is unusual. That's true, yes. May it please the court. Mr. Pizzuto is we use that term throughout the argument because that's the term that is now statutorily and medically accepted in lieu of the term mental retardation that was used in Atkins and is used in many of the opinions thus far. Mr. Pizzuto is in fact the person or type of person contemplated for the protections in Atkins. As Justice Stevens said at the very beginning of the opinion, is because of their impulsivity, their inability to make rational judgments, their inability to communicate their own defenses in any reasonable way, that puts them at risk and lowers their level of moral culpability. It doesn't exonerate, it doesn't say they shouldn't pay for the crimes that they've committed, but it exempts them from the death penalty as a result. Another concern of the court in Atkins was the fairness of the proceedings. So in this case, as far back as 1986, when Jerry Pizzuto was sentenced by Judge Reinhart, Judge Reinhart made findings of fact and aggravation of impulsivity, of no personal or close relationships, of inability to maintain and to secure and maintain employment, and particularly that he was unintelligent, uneducated, unskilled, and finally that he was unable or incapable of appreciating the consequences of his actions. Those findings are manifestations of the very things that Justice Stevens talks about in Atkins. They are also all rooted in the testimony and testified in this proceeding. Dr. Emory is one of three IQ scores that came into evidence, only two of which we believe should have been considered, admitted, or even disclosed. The other two, one was a Dr. Bieber score, which purports to be a 92, but for reasons that I'll discuss later, should not have been disclosed, should not have been admitted, and certainly should not have played any part in the ultimate findings of fact by the district court. And the third IQ was taken in 2009, many years after the fact, as a result of the state's obstruction of Mr. Pizzuto's ability to get an expert to secure the testing that we desired at the initiation of the Atkins proceedings. There are three issues in this case. The first issue does deal with the Idaho Supreme Court's unreasonable application of the law, as well as its unreasonable application of the facts. When you address this part of your argument, could you clarify for me how you're reading the Idaho Supreme Court? The argument seems to, one way of understanding it is that the statute requires an IQ of 70 and ignores the plus or minus 5 factor. That's not quite how I read the opinion. The opinion seems to indicate that the statute does call for 70 or below, but shifts the burden or places the burden on Mr. Pizzuto through the use of expert testimony to show that it's on the minus side to get below, to get 270 or below. How do you read it? I read it exactly that way, Your Honor. And for that reason, in preparing for the argument, you reread the opinions. And, you know, Judge Windmill recognized that it didn't seem to him as if the Supreme Court of Idaho had, in fact, made that finding of the bright line 70. And he, too, you know, was confused. But that was what was litigated below. And so I think there has been a bit of a red herring in the briefing here in the sense that we don't abandon that argument. If, in fact, that's what the Idaho Supreme Court found, it is an unreasonable application of Adkins. But it doesn't appear to be that that was what the Idaho Supreme Court found. What the Idaho Supreme Court, and where I start is in 2010 in another Pizzuto case, and they go through their holdings in Mr. Pizzuto's various post-convictions. They specifically cite to this case, and they say that we held in that case that the Eighth Amendment does not preclude the execution of a person who claims to be mentally retarded unless he presents expert testimony that he was below 70 and the onset was prior to age 18. So that's exactly how I read the Idaho Supreme Court. There is some confusion because of the an outrageous reading of the opinion. I just don't think it is what the Idaho Supreme Court actually decided. And therefore, I am not, while not abandoning the argument, I'm not sure that the court has to reach that issue of unreasonableness on the part of the Idaho Supreme Court. So our basic premise on the unreasonableness rests in Taylor v. Maddox and the fact that throughout the proceedings in state court, we were very clear that we needed that one because he was the only petitioner who had or ever would have under the statute of limitations an Atkins claim, most likely would have, an Atkins claim in post-conviction. His, the procedures imposed on him were significantly different than the statute contemplated for the pretrial detainee or pretrial capital defendant. In 1925-15a, the Idaho Supreme Court merely requires the pretrial litigant to raise the issue of mental having raised it, the court shall then appoint experts and the court shall have discovery and the court shall have an evidentiary hearing and then the judge, not a jury, determines whether or not the litigant has in fact shown by the preponderance that he suffers from an intellectual disability. Mr. Pizzuto coming in under 1927-195, however, the subsection 6 of 1925-15 shifts the burden basically. Not, it doesn't shift the burden of proof once you have that evidentiary hearing. That's the same. What it shifts is the burden of ever getting that hearing. And in this case, Mr. Pizzuto made it clear, one, he didn't think he should be subject to different set of rules because he, it was of no fault of his that he was coming in as a post-conviction litigant. Secondly, if he was going to be burdened by the additional showing, he needed to know what a prima facie case was of intellectual disability in Idaho. Specifically, he presented significant evidence of an IQ score of 70, a verbal IQ score of 72 and a diagnosis at sentencing of borderline intellectual deficiency. That diagnosis by the expert to the potential of the intellectual disability at that time, mental retardation. It says at this, between 71 and 75, you need to be looking at the adaptive skills and deficits to see in fact if this person has an intellectual disability. But what's your argument that the, once the expert becomes alerted, then what is legally required? Well, what, yeah, that's not, that actually wasn't the argument. What my argument is that what we presented to the district court was sufficient to raise the issue of intellectual disability. And that at that point, we should then be entitled to the opportunity, as Taylor Remadix certainly contemplates, as the United States Supreme Court contemplates, you should be given the opportunity to litigate that claim. Now, what Supreme Court case are you relying upon to support your argument that you were entitled to a further hearing, an evidentiary hearing? Well... Is that what you're arguing? That you were entitled to an evidentiary hearing once you are of the view that a threshold showing was made? We're arguing that we were entitled to a full and fair opportunity to present our claim. What does that mean? What are you saying? That means that we're entitled to notice as to what it is we have to prove. And once we get that notice, we're entitled to the ability to develop that level of evidence. Because we had sufficient amounts, certainly far more than was required under 1925-15. We had the IQ that brought you within the arguable range of intellectual disability. And we had affidavit after affidavit and school records and testimony at sentencing, all of which showed significant adaptive skills deficits. So procedurally, how would that work? How would the notice work? What would the court have to do in your view? Well, at this point, what the Idaho Supreme Court should have done, once they said, well, or the district court, the trial court should have said, you need to show me whatever it is. That's where the, is it a bright line 70? Because if it's not a bright line 70, we had actually shown that particular level of score. So, but he would say, you need to bring in an expert that opines retrospectively on the pre-18 onset of both the sub-average intellectual disability. Now, what Supreme Court opinion are you relying upon to assert your argument that notice was required from the state trial court? Well, I think notice is always required in any case. But in this case, I'm actually relying on Atkins, which envisions that the states will enforce procedures that are consistent with protecting the intellectually disabled. But Atkins doesn't specifically articulate the procedure as you've argued it. No. What Atkins says is that we'll leave it to the states. But if you read Atkins and then you read Bobby V. Bees, a case that throws out the word substantive, but does not necessarily embrace it in the manner in which the state has argued. But Bobby V. Bees does say, you know, the state has, you know, we're sending this back to the state so that the state can give him a fair opportunity to develop the issue. Well, you cited Taylor. Taylor includes a reasonable process. Is that what you're arguing, that there was not a reasonable process for? That is specifically our argument, Your Honor. So can I, in line with what Judge Rawlinson, I think, is concerned about as well, to take it back to what actually happened. The court discussed the deficiency of the proof, as it felt. And it did say that he had the, on summary judgment, he had the burden of coming up with an expert to fill in the blanks given the IQ score of 72. So looking at their opinion, they go on to the question of whether or not he had an opportunity to bring in the expert. And I'm looking at, what, the 656, one of the, it's either 734 or 656 of the Idaho Supreme Court. And they say that he didn't offer the testimony. And then they say the petitioner did not ask the district court to rule on his motion for specified additional testing. He asked the district court to refrain from dismissing the petition, if the court denied his motion for summary judgment, and give Pezzuto's counsel additional guidance as to what proof was lacking, your notice point. And then it goes on to say, if a trial court denies the party's motion for summary judgment, it has discretion to grant summary judgment to the opposing party, citing an Idaho case. And so they recharacterized the real issue presented is whether the district court abused its discretion by granting summary judgment to the state, rather than by simply denying Pezzuto's motion and giving him the requested guidance in how to proceed further. They say, when reviewing an alleged abuse of discretion by the trial court, our inquiry is, and so on, citing the Huddleston case. And then they simply conclude Pezzuto has not argued that the district court abused its discretion in this case. So that almost sounds like echoes of a procedural default, but I'm not sure how that is postured. In truth, the entire decision is a procedural default, because what they find is that we haven't made the prima facie case required by 2719-5A, and therefore, we can't move forward on the substantive claim of the post-conviction. So they're actually making that conclusion. They sound like they're entertaining the notion that you wanted the Pezzuto, but asked for clarification and an additional expert or opportunity to get the expert testimony, but says the counsel didn't ask the district court to rule on it, and then they review that under an abuse of discretion. So what do we do with that? Well, that, Your Honor, is an unreasonable finding of facts based on the record. We did, in fact, ask for a hearing, I mean, for an appointment of an expert and an evidentiary hearing throughout the proceedings. It is true that the manner in which it was phrased, the first time that I asked, I began to ask for a ruling on that, we were in a procedural posture of attempting to disqualify the trial judge, could not move forward on any substantive issue and maintain our motion to disqualify. So at that point, I said, well, I guess I can't ask you now to rule. Maybe Mr. to an expert, because that's what we needed, was the expert. And we can't get an expert in to see a death row client without either a court order or the, without a court order. And we could have gotten that court order through stipulation if the State had agreed. The State did not. Though I'm not sure that the State intentionally did not, because they later thought, oh, I thought you had that. So there was a bullox in the communication between the parties. But that wasn't the only time we asked. In every single motion, including the motion for summary judgment, which was, which is misnomered in the way, it's actually a misnomer, because there was never anything in the motion for summary judgment. But we said, we were talking about trying to get past that prima facie showing. And if they weren't going to rebut any of the prima facie showing, then perhaps that was enough. We didn't know what was enough in the State of Idaho. So we moved, we moved, let's see, they moved for summary dismissal on timeliness, because we had come in. I don't need all of these. Okay. Okay. But the thing is, Judge, and I think I've identified it in the reply brief. We repeated in every single pleading and in every appearance before the court, we asked for a hearing, I mean, appointment of an expert and a hearing. And Judge Windmill, when he gets the case, says, yeah, the argument is somewhat muddled, but it's clear she was always asking for alternative rulings. So, and that is where Taylor v. Maddox controls, is that we didn't have a reasonable opportunity. And the reason we don't have a reasonable opportunity is specifically the fault of the state and not the petitioner. Assuming then, under Taylor v. Maddox, that we are entitled to review under habeas, the findings of the district court judge are clearly erroneous. The major thrust of the difficulty in this case is the tension between common sense and instinct and the normal way in which judges weigh and judge the credibility of witnesses in a non-scientific case and what is absolutely required in an Atkins proceeding, and that is a full understanding and application of scientific and medical principles that are accepted in the community. And Judge Windmill handled it as if it were an ordinary lay witness case. So his erroneous findings arise from that. He does not determine what the scientific principles that are acceptable in the medical community regarding intellectual disability are. He accepts a finding of malingering by the state's expert, which is wholly unacceptable in the community. He then doesn't reject, but apparently lowers the weight given to the malingering tests that are all scientifically accepted in the medical community given by Dr. Weinstein. And he also takes that malingering test that is given in 2010, unrelated to any other testing or any IQ testing, and he bumps it all the way back to possibly affecting the 1972 testing, which doesn't make any sense. Effectively, what Judge Windmill does with this unacceptable malingering finding by Dr. Moore is he turns it into a character issue, that because of the Atkins decision, there's a possible motivation, and because of Mr. Pizzuto's clear history of findings regarding deceitfulness and manipulation, that there's some reason to have evidence of that. In fact, all of the acceptable scientific evidence shows that Mr. Pizzuto made good effort on the two critical IQ tests, which are the 72 and the 60. The other incident- What's our standard of review of Judge Windmill's findings in that regard? Well, we certainly have argued it in terms of clearly erroneous, and clearly erroneous is is the standard for finding the fact. However, because of the implication of Daubert and Rule 702 and the clear judicial role that he had in making the determinations that he refused to make, such as, you know, the validity, which test is the valid test, that sort of thing, Daubert could rule and that's an abuse of discretion. But it would have to be plain air because it wasn't presented below. You want to save some time? Are you going to save some time? I am, Your Honor, and I'm going to have about three more minutes to just cover the final issue. Yes, I've been tying up some of your time. I wanted to make sure you got through what you wanted to. And then the last issue, and of course it also goes pretty heavily into the clearly erroneous finding of fact, and that is the question of Dr. Beaver's IQ test, which purportedly shows a 92. Under the clearly erroneous portion of the argument, the evidence as presented shows that there's a significant reason to believe that the test is invalid. There is testimony unrebutted by the experts that the person giving the exam was not qualified. She doesn't recall any, now that's not unrefuted because I think Dr. Beaver loses the administrative assistant frequently, or did at that time. But many states require licensed psychologists, and Dr. Greenspan said that that is what is acceptable by the standards because you have to use your clinical judgment and because it calls upon the tester not to interfere with the testing. And in this case, there is evidence that she did interfere with the testing because she repeatedly refers to Mr. Pizzuto's distractibility and his inability to focus, and that with effort pushing him, I can get him to focus. Well, we know there's some interference with the testing, but because she has no recollection, we don't know how much. There is also Dr. Beaver's, the rest of Dr. Beaver's neuropsychiatric testing or it's internally inconsistent, the 92 score. And he himself testifies that he's surprised by the results. He later indicates by declaration through further consultation with petitioner, having remained a consulting witness, that further testing is appropriate. And that he believes Mr. Pizzuto may well be worthy of the protection of Atkins. Judge Windmill doesn't make any finding about the outlier status of the 92. Dr. Greenspan and Dr. Weinstein both testify that when you have multiple IQ scores, if one is way out of line with the rest of the consistent evidence, then what they do is they toss that one out. And the 92 is a clear outlier. And finally, the fact of disclosing, I think I've argued that pretty sufficiently in the brief, but the argument on the disclosure, compelling the disclosure, disclosure of that IQ test is not an effort to hide the ball because this is a clearly questionable case testing. And it is an effort to preserve the right to freely consult with your expert. And Judge Windmill's finding that by relying on Dr. Beaver and Dr. Marikangas in a completely different proceeding, though still related to Mr. Pizzuto's death sentence, on a very different issue, which was the issue of the epilepsy and the brain damage, not as evidence of intellectual disability, but as mitigation, which should have been explored by consulting with an expert in habeas as an effective trial counsel. It is absolutely impossible when Judge Pizzuto's IQ, but that it is relevant to the accuracy, it is impossible then to go through the record and pull out all of the pervasive prejudice that resulted from permitting that 92. I'll save the remainder for my rebuttal. Thank you, Counsel. May it please the Court. There are two, despite the many subclaims, two primary issues before this Court. And that is whether Pizzuto met his burden in establishing two of the elements under Atkins as codified by 1925-15a. Those two elements are his IQ, whether it was 70 or below, and whether he established that his IQ was 70 or below prior to his 18th birthday. The issue of adaptive function is not before this Court because the Idaho Supreme Court didn't rule on it. And quite frankly, the state hasn't challenged Judge Windmill's findings because they're not clearly erroneous, which is a very high burden. The same burden, though, for adaptive functioning on clearly erroneous has to apply to the question of whether his findings are clearly erroneous as to whether Pizzuto's IQ was 70 or below prior to his 18th birthday. So how do you read the Idaho Supreme Court? Are you arguing that it's a hard 70? Yes, Your Honor, we are. Well, why? And I understand the Court's concern, but... So what was all the talk about having an expert to clarify whether he was mentally retarded before age 18 and that you can't rely on IQ scores alone? And I guess... And I sure don't understand why you're pushing for your argument. And I guess, Your Honor, what I'm trying to say is that the Idaho Supreme Court made alternative findings because what we really had at that point in time... The very first sentence where they say, First, when enacting Idaho Code 1925-15a, the legislature did not require that the IQ score be within five points of 70 or below. It required it to be 70 or below. You want us to evaluate the Idaho statute on this all-or-nothing hard number. Is that it? I don't have a problem with that, Your Honor. What if we were to have a problem with that? And I can appreciate that, Your Honor. But again, I think the Idaho Supreme Court made an alternative determination immediately thereafter when Pizzuto was arguing that it was wrong, that the court should have made a determination, meaning the trial court, should have determined that it was plus or minus. And the Idaho Supreme Court came back and said at that point in time, you know, it really doesn't matter because it is an or. It's plus or minus. And Pizzuto didn't meet his burden if that's the direction that Atkins really goes. And the problem that I have is that Atkins, when you look at the holding of Atkins, it doesn't require SEM or the Flynn effect, which are still to this day, even after the evidentiary hearing in front of Judge Windmill, very controversial entities, I guess you could say, but principles. I understand generally what they mean, what they are. I think I understand what they mean and what they are. But they're not required by Atkins. There have been several states that have adopted bright line rules. There are some states following Atkins that have a 65 or below cutoff. There are some states that have a 75 or below cutoff. And there are realms within those. Now, are those states somehow incorporating standard error of measurement or Flynn? I don't know the legislative history of those particular statutes. But what I do know is that the states are permitted to do that under Atkins because the only holding in Atkins is that you can't execute someone that is mentally retarded. And the definition for mental retardation is left to the states to determine. The question under 2254 D is not whether the Idaho Supreme Court unreasonably applied the standards from the AARM or any other psychological psychiatric community. The question is whether they unreasonably applied Atkins. So if it were scientifically established that no IQ test can be 100 percent on point so that if you get a IQ score of 72, there is always a margin of error, as you say, in political elections, polling, whatever. You don't count on it because it's not definitive, but it's an indicator. And so you're saying that the Idaho Supreme Court, the Idaho statute picks 70 as the cutoff. It's bright line. And even if a 70 as a matter of scientifically accepted medical knowledge means a 70 could also be as low as 65. And 65 is pretty clearly below what Atkins was contemplating. But that's still not an unreasonable application of Atkins? No, it's not, Your Honor. And the reason that it's not is because we have to look at the law as it existed at the time that the Idaho Supreme Court made its decision. Not as it may be today or it may be tomorrow, but at the time the Idaho Supreme Court made its decision, it was relying upon Atkins. It wasn't even relying upon, I believe it's Bobby v. Baez, which came out after the fact where the United States Supreme Court said, again, reiterated, we are leaving the determination of what constitutes mental retardation to the states, both substantively and procedurally. Counsel, if I could ask you a context, do the standards of the AEDPA, are they operative or not? Absolutely, Judge Gould. The standards of the AEDPA apply both 2254 D1 and D2. So that the petitioner has to show, the appellant has to show an objectively unreasonable application of Atkins or some other Supreme Court precedent or an unreasonable determination of the facts. That is correct, or contrary to, and I don't believe, although there's some discussion in Supreme Court's decisions about how contrary to and unreasonable applications sometimes merge a little bit, but yes, in response to your question, Judge Gould. In this case, there's no, I didn't understand there to be an argument that the Idaho court was picking a different standard than Atkins. I thought it was a question of their application rather than contrary to. I believe it is their application. Is it an objectively unreasonable application of Atkins? That's yes, Your Honor. Okay, thank you. That is. But I will move into the question of the evidentiary hearing in front of the trial court. Well, could you address the question I raised with counsel about the Supreme Court's rationale for justifying not pursuing the additional testing to deal with the deficiencies that the court had identified, particularly since everything rose or fell, apparently, in your view, on whether he could bring it below, at 70 or below, before he was 18? Absolutely, that's where I was going, Judge Fischer. Counsel is more or less correct as far as her recitation of the proceedings. The state filed the motion for summary dismissal, not based upon genuine issue of material fact, but whether Atkins was retroactive and whether the post-conviction petition was timely. Yes, there was the request for the motion for the expert to come in and test. What is particularly interesting, though, in that motion is that there was no motion, no mention, no discussion of IQ testing. There were four things in that motion that were requested. A neuroprofile five-hour glucose tolerance test and urinalysis. As I understand it, that's to determine diabetes. An EEG, that's heart. An MRI, that's brain. The PEP and the SPEC are also brain. No discussion whatsoever of an IQ test. The issue was IQ at that point, not brain damage. Well, wait a minute. Arguably, that's why the court pointed out that Pizzuto did not ask the district court to rule on his motion. It asked the district court to refrain from dismissing the petition and give Pizzuto's counsel additional guidance as to what proof was lacking. So the fact that the motion had been filed, then the question was, we want to know what it is we're deficient in. And so IQ became the key thing. So why would the request be deficient with that kind of outstanding caveat to what they were looking for? Taylor does say, if you're going to uphold and get the presumption of legitimacy for the court's findings, you have to have an adequate process to allow the petitioner to make his case, particularly in this one, it would seem, where it all turns on expert testimony and alternative holding or otherwise. It is clear that the Idaho Supreme Court recognized it was important for him to have an expert. And I don't know that I'm disagreeing with anything you've said, Judge Fisher. What I'm saying is that there was an enormous amount of confusion that was generated not by the state, but by Pizzuto's counsel. There was the specific request not to rule on that motion at the time that we argued the motion to disqualify in the interlocutory appeal. Yes, there were other requests to do this and to do that throughout the proceedings, but the reality is under Idaho law, once Pizzuto filed his motion for summary judgment, he abandoned that request. He was no longer requesting additional information on how do I meet my burden, which should have been clear from the statute. He was saying that under Dr. Emory's IQ score, the IQ score derived in 1985 by Dr. Emory, the 72 score, we've met our burden and we're going to live or die on that. And merely because Pizzuto's counsel wasn't aware or was uninformed or whatever reason that if you file a motion for summary judgment that the state court can then come back and grant summary judgment to the other is not the issue. The issue is due diligence. And that is a failure on Pizzuto's part to establish that diligence to obtain whatever it was that they wanted as far as testing that may have been beyond what they wanted from Dr. Marikangas, those four things that I referenced. I don't know. But in and then say, oh, and if we don't win on summary judgment, tell us what it is that will get us summary judgment. Don't rule for the other side. Just tell us what it is we need. That isn't the law in Idaho. Well, that's not exactly what the Idaho Supreme Court, the way you've articulated that they don't state it that way. They basically say there was no abuse of discretion argued. Well, but Judge Fischer, there was certainly reference to the Harwood case, I believe it was. And Huddleston. Huddleston, thank you. And they do also cite Harwood, yes. Yeah, I thought there was Harwood in there. But the bottom line is that it's based upon state law. And that's something that can't be challenged before this court. That's not a habeas issue. I don't know. I don't know but above and beyond all that, assuming, and we're certainly not conceding this in any way, shape, or form, that due diligence was exercised. And in fact, due diligence and tailor for that matter still plays a part after pinhole stern. We've discussed in our brief why we believe it may not continue to play a part. I don't want to repeat that now. I want to go to Judge Windmill's particular. The burden, as I started to mention earlier, is a significant burden. And what is particularly interesting in this case is that to apparently get over that burden, the allegation is that the, and I'm going to refer to her as Robin because she changed her name, the lady that gave the test. There's just no science associated or that was presented at the evidentiary hearing establishing the fact that if you have a very attractive test giver, that somehow your number, your IQ score is going to be inflated. Just no science in the evidentiary hearing from Dr. Greenspan or anybody else. Dr. Moore referenced it. He said it might be possible, but there's no clear science on that. Above and beyond that, counsel and Pizzuto has argued that those other tests that were given by the test giver to Pizzuto were so low that they don't correspond real well with that 92 or 90ish IQ. That also is not true. In our brief, there were some low ones, but particularly I believe it was the RAT, and I don't remember which version, he scored in the 34th percentile, not in the low percentile that someone with a 72 or a 60 IQ would have. Those other tests were in fact pretty comparable as testified to by Dr. Moore for the most part. Not all of them, but for the most part were pretty comparable to that 90 something IQ. The bottom line on this is that Pizzuto can't meet his burden of establishing that there should be a definite and a firm conviction that a mistake has been committed in this case. Basically what Mr. Pizzuto is asking is that this court, after the fact, make the credibility determinations that Judge Windmill made. And that isn't the role of this court. Judge Windmill credited Dr. Moore's testimony. He watched Dr. Moore as he testified. He listened to the testimony, saw the demeanor. He watched Dr. Greenspan, saw his demeanor. Dr. Greenspan, with all due respect to Dr. Greenspan, was a horrible witness on cross-examination. He didn't answer questions. He avoided questions. Dr. Weinstein actually made concessions on cross-examination. And in fact, to be perfectly candid with the court, when I wrote the brief for this court, I relied primarily upon the testimony of Dr. Weinstein that was supported by Dr. Moore. The bottom line on this case is that Pizzuto cannot meet his burden of establishing that those findings are clearly erroneous and irrespective of the AEDPA then. This court should affirm the determination that Gerald Pizzuto failed to meet his burden of establishing those two criteria under 1925-15a. Unless the court has questions? Thank you. I have no questions. If the state is relying on the testimony of Dr. Weinstein, Dr. Weinstein testified unequivocally that he, based on, it was his expert opinion, based on the testing that he conducted, the review of all of the data that he was given, the convergence of the data, that Mr. Pizzuto was intellectually disabled, that he suffered from a sub-average intellectual functioning and significant adaptive deficits pre-18. So his testimony is unequivocal. It's unchallenged. It is a retrospective diagnosis of intellectual disability. The petitioner met his burden when the petitioner was given the expert that he asked for throughout the state proceedings. There is a challenge not only to the unreasonableness of the state court as contrary to law, but also to their findings of fact. And the record in the state court does not support the Idaho Supreme Court's decision on the summary judgment motion for two reasons. One, it's clear throughout in every pleading and every appearance that there was no abandonment of the request for a hearing. And there's a distinction between the proof and the prima facie case. But secondly, the state of Idaho finds that the, excuse me, the Supreme Court of Idaho finds that the state of Idaho made no finding, made no motion for summary judgment. Well, they did in fact make a motion. They made one on timeliness and then in reply made one on prima facie case, on a prima facie case. Once you have booming motions for summary judgment, the question is no longer an automatic abandonment of your request, your other requests. So based on that unreasonable finding of fact, they came to an unreasonable conclusion of law. One of the things that the state of Idaho just said that the test that he referred to, a non-IQ test, somehow shows that you don't have a 70 IQ. IQ test, there's an internal inconsistency within Dr. Beaver's testing, not as it goes to the IQ, but as the full profile of neuropsychological testing that Dr. Beaver did. And his 1996 document goes to the brain damage issue and emphasizes a number of issues. The other thing that the testing request does in fact ask for IQ, though it doesn't specifically say IQ, it asks for the full neuro, if you look at Dr. Beaver's declaration supporting it, he suggests further neuropsychological, full profile psychological testing. When Mr. Anderson asked Dr. Beaver about that request, Dr. Beaver admitted yes, he was in fact saying get some more IQ testing. And the other thing that I wanted to, oh, the validity of the 92, Dr. Moore, their own expert, says yes, there can be a fluke. And that was pursuant to questioning by the court. So that was another reason that I didn't mention. But there are many reasons in this case. Oh, and the unreasonableness of the Supreme Court's facts, I'll finish, goes not to, it's that they derive opinions or speculate as to what Drs. Beaver and Marikangas meant in state court. And based on that, make inferences contrary to the facts of Mr. Pazuta's disability. Thank you, Your Honor. Thank you very much, counsel. Thank you. We appreciate the arguments of counsel on both sides. These are very difficult cases. And especially when the Supreme Court sets up new standards for us, we appreciate the role counsel take in giving us their views. So we will submit this case now. And you'll hear from us. So the court is adjourned. Thank you.
judges: Fisher, Gould, Rawlinson